[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a limited contested dissolution of marriage action. The action was brought to the Judicial District of New Haven by a summons dated November 10, 1998, with a return date of December 15, 1998. The allegations of the complaint are that the parties CT Page 3537 were married in Pocatello, Idaho on January 15, 1975. The complaint alleges that the parties have resided in the state of Connecticut for at least one year prior to the date of filing, that there are no children born to the parties that are issue of this marriage, that there has been no receipt by either party of financial assistance from the state of Connecticut and that the marriage of the parties has broken down irretrievably. The allegations of the complaint are found to have been proven.
The plaintiff, David Goldman is 48 years of age. He has a degree in the field of pharmacy which was earned in Idaho, and followed by other studies. He enjoys good health The husband testified that during the initial years of the parties' marriage, he was still studying. His education began in California and then he finished his degree in Idaho. During the period of the husband's education, the parties were supported by his parents and also by some educational stipends. Initially, Mrs. Goldman was not able to work due to the fact that she did not have the proper immigration papers. Eventually, she did work at both an administrative office, and as a cashier in a restaurant. Mr. Goldman is presently employed in pharmaceutical research at the Bayer Corporation in West Haven. His weekly gross income according to his financial affidavit is $3,191.00. His wages as reported on his W-2 for 1998 were $177,274.00.
Mrs. Violet Goldman is currently 50 years of age. She received a degree in art from the California Institute for the Arts in Graphic Design. She is a graphic artist. She came to this country from Hong Kong at the age of 18 in order to study. During the course of the marriage Mrs. Goldman worked initially at jobs as described above. She worked in an, art gallery when the parties lived in Buffalo well in excess of 15 years ago. She has not worked since. Mrs. Goldman's income has never been significant. While she made some contribution to the support of the parties while Mr. Goldman was finishing his education, her income has never been sufficient to fully support both husband and wife. More recently, Mrs. Goldman has developed a catalog of artwork which is created by computer (Plaintiff's Exhibit 33). Despite the creation of that body of work, Mrs. Goldman has not sold a single piece of her artwork. Mrs. Goldman is limited in her ability to market her artwork, and its commercial appeal is unproven. Her history of earnings as well as her job skills are limited at this point. In addition, the issue of Mrs. Goldman's health, which is discussed subsequently, most seriously effects and inhibits her earning capacity. CT Page 3538
The health of the defendant Mrs. Goldman is the most significant aspect of this case. There were three medical experts who testified during the trial of this case. Two were psychiatrists, Dr. Cyril Wyanik, who is the defendant's treating psychiatrist, and Dr. Howard Zonana, who was the plaintiffs expert witness. In addition, Madeline Banaoski, PH.D., a clinical psychologist testified. Dr. Banaoski is a consultant to Dr. Zonana and; performed a number of psychological tests in furtherance of the "independent medical exam" requested by the plaintiff. The testimony of Dr. Wyanik was that Mrs. Goldman suffers from obsessive compulsive disorder as well as depression. He based his analysis on his 49 years in the practice of medicine and psychiatry, and described in some detail her rituals and ritualistic behavior which are the principal manifestations of obsessive compulsive disorder. He explained that the disorder itself, in its simplest form, is a manner of coping with stress. A progression occurs in which simple rituals, such as washing hands, evolve into increasingly complicated ones such as are present in Mrs. Goldman. Dr. Wyanik testified that Mrs. Goldman's waking hours are primarily occupied by her fear of contamination. That fear results in her engaging in a number of rituals which includes hand washing, wrapping herself in layers of clothing, washing with alcohol, fear of using public facilities and a number of other symptoms. She has extreme difficulties with basic everyday functions such as retrieving her mail, leaving the house, and grocery shopping just to name a few. It was Dr. Wyanik's opinion that Mrs. Goldman was also experiencing "antidonia", which is a symptom of depression in which one takes no pleasure from any of life's activities. The result of antidonia is that one sleeps poorly, concentrates poorly, and suffers from the result of impaired thinking and decision making ability. Her prognosis is, poor due to the fact that she has suffered from obsessive compulsive disorder for nearly twenty years. In addition, Dr. Wyanik describes Mrs. Goldman as currently weighing 80 lbs, being without any emotional support system, without friends, and without family in this area. Her slight weight makes medication problematic, and perhaps ineffective. He noted that she had previously been a normally functioning individual. He also noted that she is aware of her behavior, but she cannot voluntarily help her behavior even if she knows that it defies common sense.
Dr. Wyanik confirms that Mrs. Goldman had related instances of abuse by Mr. Goldman to him in the course of her treatment. Dr. CT Page 3539 Wyanik was also able to describe some of the rituals to which Mr. Goldman was subjected. For instance, he was required to phone on his way home from work. He was required to park his automobile in a certain spot, to remove his briefcase from a certain place in the automobile. He was required not to use a key. He was required to undergo the spraying of his hands with alcohol and a specific ritual by which he changed his clothes. He was also required to undergo specific rituals prior to defecation and other ordinary functions. He described their relationship as one of "dependency/hostility" He also described the symptoms of obsessive compulsive disorder to be "relentless".
The testimony of the plaintiff's medical experts served in effect to fully confirm if not expand the analysis done by Dr. Wyanik. Dr. Banaoski testified that based on her clinical examination, it was her opinion that Mrs. Goldman suffered from a phobic disorder (obsessive compulsive disorder), a personality disorder, high levels of anxiety, low self-esteem, depression, and a schizotypal personality. Dr. Zonana confirmed the diagnosis, and also went so far as to travel to the defendant's home in order to observe some of the defendant's rituals firsthand. He did observe that the defendant kept a number of items in her freezer, including toilet paper, a portable phone, mail, and other items which she was attempting to decontaminate. The home was quite sparse in terms of furniture. Because of the defendant's condition, the parties had allowed virtually no one into their home since it was built. Even the plaintiff's appraiser was asked to wear special boots and an overcoat in order to inspect the property. Dr. Zonana, like the other two doctors, testified that Mrs. Goldman's symptoms have been of long standing duration. He agreed that this is significant in terms of her prognosis, as the longer the symptoms last, the less the likelihood of successful treatment and recovery. It was Dr. Zonana's conclusion that Mrs. Goldman was not malingering and had a poor prognosis. Mrs. Goldman's condition is further significant in that it has and will continue to effect her ability to work. The court finds that based on her medical condition, the limitations of that condition, her lack of experience in the work place, and her lack of a significant or proven history of earnings, that Mrs. Goldman has no present earning capacity.
Apart from the medical testimony, the history of the parties is that they met in California while both were students. The parties eventually moved to Idaho in pursuit of Mr. Goldman's education. The parties were married at the time they lived in Idaho. From CT Page 3540 Idaho the parties moved several times in furtherance of Mr. Goldman's education and career. The places where they lived included Buffalo, Pennsylvania, New Jersey, and eventually they moved to Connecticut. Mrs. Goldman describes her husband as being controlling, possessive, and abusive. She indicates that he was very jealous of her and that his jealously took the form of a number of controlling and demanding behaviors. Mrs. Goldman describes a pattern wherein Mr. Goldman's anger and rage climaxed in his physical abuse of her. Following an episode of abuse, Mrs. Goldman indicates that her husband would be extremely remorseful, and then take whatever steps were necessary in order to make up with her. She states that he could be extremely kind and thoughtful, especially when making up for an incident of abuse. Mrs. Goldman states that her husband was essentially the bread winner and controlled the money. She had very little knowledge of the parties' finances. She testified that at some point during the marriage, Mr. Goldman and she made an agreement that she could withdraw jointly held funds in order to place them in accounts bearing her name only, in an amount equal to retirement funds held in his name by his employer. Those transactions took place over a number of years but most significantly in 1997 and 1998, and are shown in part by plaintiff's exhibits numbers 7. through 13, inclusive.
The plaintiff, Mr. Goldman, denies any knowledge of an agreement to transfer funds into Mrs. Goldman's name only. He also denies that he had knowledge that this was actually occurring. Mr. Goldman denies he was abusive, and asserts that Mrs. Goldman was extremely difficult and controlling to live with, primarily because of her obsessive fear of contamination. He also testified that Mrs. Goldman was very much aware of the finances of the parties and took a very keen interest of affairs having to do with money.
A number of claims were raised in the course of the trial as to loans made by the defendant's father to the parties and also a loan from the defendant's sister to her when she was contemplating purchasing an apartment in New York City. There is evidence that the parties did receive money from Hong Kong when they began to purchase land and construct their home in Connecticut (Defendant's Exhibit "H"). The amounts indicated in Defendant's Exhibit "H" are approximately $160,000.00. The defendant had listed a loan to her father in the amount of $260,000.00 on her Financial Affidavit dated September 27, 1999. In subsequent affidavits, the amount of the loan was listed as CT Page 3541 $55,000.00. There was no credible evidence that the money received was a loan. Further, there is no credible evidence that a request or demand was made for repayment of the loan when funds were transferred by the defendant to Hong Kong. The timing of the "repayment" of the alleged loan is suspect. The court is not a devoted believer in coincidence. The court finds that the defendant has failed to prove the existence of either a loan to her father or to any of her sisters. Accordingly, the court finds that the sums transferred under this pretext were transferred in violation of the automatic court orders and will be credited to the defendant in the division of the parties' remaining assets. In addition, there has been evidence as to other violations of the automatic court orders including the purchase of automobiles by both parties and the withdrawal of funds by the parties from several accounts. Each one of those claims has been considered, the claims of counsel reviewed, and they also have been taken into account, and credited as appropriate by the court in the entry of its orders and in the division of the property of the parties.
After considering the relevant statutory criteria, court orders that the marriage of the parties is dissolved.
The plaintiff shall pay to the defendant $1,000.00 per week as alimony. The alimony shall terminate upon the death of the defendant, her remarriage or cohabitation (as defined by statute), or March 18, 2014, whichever shall first occur.
The plaintiff shall maintain the life insurance listed on his financial affidavit of January 24, 2000 in effect for the benefit of the defendant in order to secure the obligation to pay alimony as stated above.
The plaintiff shall transfer to the defendant all of his right title and interest in the property known as 15 Skyline Drive, Easton, Connecticut. The court finds the value of that property at the time of this dissolution to be $650,000.00, in its present condition. The defendant shall be responsible for any taxes, insurance, maintenance and any and all other costs, repairs and expenses of any kind with respect to this property. Further, the defendant shall hold the plaintiff harmless from any claim with respect to this property.
The defendant shall be the owner of all of the contents located in the home at 15 Skyline Drive, Easton, Connecticut, except as CT Page 3542 otherwise provided.
The parties shall each own the motor vehicle listed on their respective financial affidavit, and shall hold the other harmless from any claim arising from that vehicle.
The plaintiff shall own and retain, free of any claim from the defendant, the following accounts (designated by the last four digits) as listed on his financial affidavit dated January 24, 2000:
 New Haven Savings Bank No. 0236 $4,684.00 No. 3032 $6,868.00
Fleet Bank No. 1287 $12,146.00
 Fidelity Investments No. 8270 $123,596.00 Waterhouse Securities No. 2317 $103,392.00 Merrill Lynch No. 1R62 $65,728.00 Fidelity Investments No. 0644 $23,843.00 Prime Bank $3,164.00
The defendant shall own and retain, free from any claim of the plaintiff, the: following accounts as listed on her financial affidavit of January 24, 2000, or as indicated:
 Waterhouse Securities $37,055.00 Dean Witter Reynolds $13,000.00 Fidelity Investments Annuities/IRA $13,984.00 Peoples Bank (Def. Exhibit "E") $11,447.00 Merrill Lynch $11,322.00
The plaintiff shall convey to the defendant, by way of a Qualified Domestic Relations Order, the sum of $100,000.00 from his Vanguard 401K account, ending in No. 3868, listed with a value of $465,567.00. He shall retain the balance of that account as his own, free from any claim of the defendant.
The defendant shall convey to the plaintiff the sum of $300,000.00 from her Fidelity Investments account, ending in No. 2685, listed with a value of $430,531.00 and shall retain the balance of that account as her own, free of any claim of the plaintiff.
The defendant is ordered to return to the plaintiff his Toshiba CT Page 3543 notebook computer, and his desktop computer. The plaintiff shall return to the defendant all her computer art files, and all catalogs of her art work. Those items to be returned within thirty (30) days of the entry of this judgment.
Each party shall be responsible for the payment of their respective counsel fees.
Each party shall be liable for the payment of the debts listed on their respective financial affidavits, unless otherwise specified herein. Each party shall hold the other harmless from any claim or liability for the debts as listed on their financial affidavit, as well as the debts due to either counsel.
The plaintiff shall continue the defendant's health insurance coverage under the provisions of COBRA for a period of sixty (60) days at his expense. Thereafter, the defendant may choose to continue that coverage pursuant to the provisions of the statute at her own expense.
Antonio C. Robaina, Judge.